UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VINCENT IODICE,

                              Plaintiff,

              -v.-

ARCHCARE AT TERENCE CARDINAL
COOKE HEALTH CARE CENTER,
1199SEIU UNITED HEALTHCARE
WORKERS EAST, and JANICE ATKINS,

                              Defendants.

20 Civ. 4217 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Vincent Iodice brings this action against Defendants Archcare at Terence Cardinal Cooke Health Care Center ("Archcare"), 1199SEIU United Healthcare Workers East (the "Union"), and Janice Atkins ("Atkins," and together with the Union, the "Union Defendants," and all together, "Defendants"), asserting claims against Archcare and Atkins for hostile work environment and disparate treatment pursuant to 42 U.S.C. §§ 1981 and 1985; the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290 to 301; and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-107 to 8-134. Plaintiff also brings claims against all Defendants for conspiracy to discriminate based on race pursuant to 42 U.S.C. § 1985, and for aiding and abetting discriminatory conduct pursuant to NYSHRL § 296(6) and NYCHRL § 8-107. Finally, Plaintiff brings a claim against the Union for breach of the duty of fair representation, and against Archcare for breach of the relevant Collective Bargaining Agreement (the

"CBA"), pursuant to Section 301 of the Labor Management Relations Act of 1947 (the "LMRA"), *as amended*, 29 U.S.C. § 185.  Archcare and the Union Defendants have filed separate motions to dismiss the operative Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth in the remainder of this Opinion, the Court finds that Plaintiff has failed to state a claim under federal law, and declines to exercise supplemental jurisdiction over his remaining claims.  Accordingly, the Court grants Defendants' motions to dismiss.

BACKGROUND[1]

## A.   Factual Background

### 1.   The Parties

Plaintiff is a Caucasian male who resides in Bayville, New York, and has been an occupational therapist since 2004.  (TAC ¶ 5; Award 2).  Archcare, a domestic not-for-profit corporation organized under the laws of the State of New York, provides long-term and short-term disability care and specialty services to disabled patients.  (TAC ¶ 6; Award 2).  The Union is organized under the laws of the State of New York, and was established to, *inter alia*, represent the interests of healthcare workers.  (TAC ¶ 7).  At all times pertinent

---

[1]   This Opinion draws its facts from the Third Amended Complaint (the "TAC" (Dkt. #63)), the well-pleaded allegations of which are taken as true for the purposes of this Opinion, and the exhibit attached thereto — namely, the Opinion and Award of Arbitrator Philip L. Maier of the American Arbitration Association ("AAA"), dated July 6, 2021 (the "Award" (Dkt. #63-1)).  For ease of reference, the Court refers to the Union Defendants' memorandum of law in support of their motion to dismiss as "Union Br." (Dkt. #67); to Archcare's memorandum of law in support of its motion to dismiss as "Archcare Br." (Dkt. #69); to Plaintiff's consolidated opposition brief as "Pl. Opp." (Dkt. #71); to the Union Defendants' reply brief as "Union Reply" (Dkt. #74); and to Archcare's reply brief as "Archcare Reply" (Dkt. #75).

to the TAC, Atkins was employed by the Union as a Contract Administrator. (*Id.* at ¶ 8).

In January 2012, Plaintiff began working for Archcare as an occupational therapist; in this capacity, Plaintiff interacted with disabled patients — including children — to help them become more independent in their everyday lives. (TAC ¶¶ 9, 11). Plaintiff explains that he chose this profession because he understands the plight of the disabled, as he was affected by a tragic car accident in his youth that placed him in a severe coma for months. (*Id.* at ¶ 13). As a result of this accident, Plaintiff had to relearn how to walk, talk, and become independent. (*Id.*). To this day, Plaintiff walks with a visible limp and has titanium in his body to support his limbs. (*Id.*).

### 2. The Incident and Its Aftermath

During his tenure at Archcare, Plaintiff had what he describes as an excellent employment record. (TAC ¶ 10). He received commendations and acknowledgement from his peers for his exceptional work product; the children with whom he worked responded well to him; and the children's parents "loved" him. (*Id.* at ¶¶ 10-11). The facts that follow form the foundation of Plaintiff's claims in this matter: One of Plaintiff's patients was a child whom Plaintiff describes as "African-American, severely disabled[,] and non-verbal." (*Id.* at ¶ 12). Plaintiff ordered and helped design a "special tomato stroller" containing a positioning cushion for this patient and looked forward to observing the

patient's reaction to the new stroller.  (*Id.*).[2]  On October 4, 2019, Plaintiff observed the patient resting comfortably in the new stroller and thought that the patient looked "adorable" sitting in it.  (*Id.* at ¶ 14).  Plaintiff stated, "My little monkey looks so comfortable."  (*Id.*).  Ms. Melanie Drax, an African-American nurse and Plaintiff's coworker, overheard Plaintiff's statement and responded sternly, "What did you say?"  (*Id.* at ¶ 15).  When Plaintiff repeated his statement, Drax exclaimed, "You're so racial!"  (*Id.* at ¶ 16).[3]  Plaintiff alleges that he had no discriminatory intent and did not perceive that he had done anything wrong, as he frequently used the same words when referring to his own children at home.  (*Id.* at ¶¶ 16-17, 34).  Accordingly, he was surprised when, later that day, a physical therapist approached him and told him that some of the Certified Nursing Assistants ("CNAs") at Archcare were talking about his earlier statement.  (*Id.* at ¶ 17).

Plaintiff alleges that at some point after the October 4, 2019 incident, a Union shop steward named Maxine Washington contacted the parents of the child whom Plaintiff had referred to as a "little monkey," and left them a voicemail stating, "[Plaintiff] is a racist and we will do everything to protect your child."  (TAC ¶ 18).  The child's parents contacted Archcare and shared the voicemail with Shirlene Jackson, a Clinical Social Worker at Archcare, and

---

[2]     The Court understands Special Tomato to be a manufacturer of products for children with special needs, including strollers and seats.  *See* https://www.specialtomato.com/ (last visited September 8, 2022).

[3]     Drax testified before the Arbitrator that she remembers Plaintiff's statement to be, "Let's transfer this little monkey into the chair."  (Award 4).

Lucybelle Agpawa, Plaintiff's immediate supervisor.  (*Id.* at ¶ 19).  The child's parents indicated that they did not want Plaintiff to be terminated, insisting that their son had bonded closely with Plaintiff, that Plaintiff was doing a great job, and that they did not believe Plaintiff was racist.  (*Id.* at ¶ 20).  Washington was never reprimanded for leaving the voicemail.  (*Id.* at ¶ 19).  Sometime in October 2019, Washington approached Jackson and stated to her, "You know [Plaintiff] is a racist."  (*Id.* at ¶ 21).  Jackson subsequently communicated Washington's statement to Plaintiff.  (*Id.* at ¶ 22).

On October 7, 2019, Agpawa advised Plaintiff to "get a [Union] delegate" and to meet her in her office.  (TAC ¶ 23).  Plaintiff immediately secured a delegate to assist him.  (*Id.* at ¶ 24).  During the meeting in Agpawa's office, a nurse practitioner identified in the TAC only as "Ms. Alexander" informed Plaintiff that a coworker had called the compliance hotline to report that Plaintiff had uttered racial slurs to a staff member and a patient.  (*Id.*).  Plaintiff provided Agpawa with a written explanation that read in part,

> On Friday, while working with [the patient] … I provided him with a different stroller along with a full body padded insert.  This insert and stroller really fit his postural needs nicely.  I was so thrilled and excited I expressed a thought of endearment by saying "my little monkey is comfortable."  This is what I call my daughters as a term of endearment all the time when I am excited about their accomplishment.  There was no intent of malice or discriminat[ory] manner of any sort towards my resident.  I have enormous levels of compassion for all of the children here on specialty.

(Award 4).  Despite Plaintiff's denial of any malice or discriminatory intent, Agpawa immediately suspended Plaintiff for one week pending an investigation

by Archcare.  (TAC ¶ 26).  Agpawa further instructed Plaintiff to sign a Disciplinary Action Notice, but he refused because it contained allegedly false allegations against him.  (*Id.*).

### 3. Plaintiff's Termination

On or about October 11, 2019, Archcare completed its investigation and permitted Plaintiff to return to work on October 14, 2019, on the condition that he provide written letters of apology to each of the CNAs who were allegedly present when he made the statement about his patient.  (TAC ¶ 27).  While Plaintiff was certain Drax had been the only CNA to witness the incident, he "did not want to quibble over minor inaccuracies" and quickly agreed to Archcare's terms.  (*Id.* at ¶ 28).  Agpawa instructed Plaintiff to return to work on October 14, 2019, and to report to a Latina nurse practitioner identified only as "Ms. Cumanda" in the TAC.  (*Id.*).  Upon Plaintiff's return to work, Plaintiff relayed Agpawa's instructions to Cumanda, who replied with hostility, "I have nothing to say to you, just return back to your normal duties."  (*Id.* at ¶ 29).  Later that day, Alexander instructed Plaintiff to write apology letters to the three CNAs who had allegedly heard Plaintiff's statement and had been offended by it:  Drax, Erica Dixon, and Majinda Shahu.  (*Id.* at ¶ 31).[4]  Plaintiff wrote a letter of apology which read:

> Dear Fellow Staff Members: I sincerely apologize for ... words of endearment towards my patient that you have

---

[4]     While the TAC alleges that only Drax had witnessed the incident, the Award states that three CNAs were nearby when Plaintiff made his statement: Drax, Erica Dixon, and Melinda Shahu.  (Award 2).  The Award further states that when Agpawa advised Plaintiff that he could return to work, she made no mention of writing an apology.  (*Id.* at 4).

> taken the wrong way.   I[n] no way would I ever use
> language or actions that would harm anyone in any
> way.   I sincerely apologize for any misunderstandings
> of any sort.   Please forgive me.

(Award 5).  Plaintiff read his letter aloud first to Shahu, who is white.  (TAC ¶¶ 31-32).  Shahu immediately accepted Plaintiff's apology and told him, "I'm so happy you're back."  (*Id.* at ¶ 32).  Dixon rejected Plaintiff's letter of apology outright, and Drax was absent from work that day.  (*Id.*).

That same day, Alexander came back into Plaintiff's office and instructed him to meet with a delegate to rewrite the letter, and to include the CNAs' names on the new version of the letter.  (TAC ¶ 33).  Plaintiff met with Union delegate Sandra Ifill, an African-American nurse, who told Plaintiff, "You need to take out the phrase words of 'endearment,' make it short, [and] apologize for what you said[,] begging for forgiveness."  (*Id.* at ¶¶ 33-34).  Plaintiff refused, telling Ifill that his statement about the patient was intended to express feelings of endearment.  (*Id.*).  Ifill told Plaintiff, "[I]f you want to keep your job, then you have to change it."  (*Id.* at ¶ 35).  Plaintiff conceded and deleted the word "endearment" from his apology letter, then re-read his apology letter to the two CNAs who were present at work that day.  (*Id.* at ¶¶ 35, 38).  Once again, Shahu accepted his apology, but Dixon did not.  (*Id.* at ¶ 38).  During Plaintiff's first week back at work, he took a sensitivity training course and realized for the first time that his statement could offend an African-American person.  (Award 11).

On October 17, 2019, a nurse came to Plaintiff's office and instructed
him to find a Union delegate and report to the office of Christene Nation-
Jumpp, Archcare's Senior Director of Human Resources.  (TAC ¶ 40).  Nation-
Jumpp has worked for Archcare for 14 years and has been involved in labor
and employee relations for the past decade.  (Award 6-7).  She is experienced in
administering CBAs and disciplinary actions.  (*Id.* at 7).  Ifill accompanied
Plaintiff to Nation-Jumpp's office, where the two met with Nation-Jumpp and
Union Contract Administrator Janice Atkins.  (TAC ¶ 41; Award 7).  Ifill,
Atkins, and Nation-Jumpp are all African-American women.  (TAC ¶ 41).
Nation-Jumpp began the meeting by stating, "The parents of the patient have
heard what you said, and they are upset and want to sue [Archcare].  I cannot
have this here.  You are a liability, and we came to a decision that we are going
to terminate you."  (*Id.*).  Plaintiff understood Nation-Jumpp's characterization
of the parents' reaction to be false, as Jackson had informed him that the
child's parents were very happy with his performance and did not believe he
was racist.  (*Id.* at ¶ 42).  Plaintiff believed that he was being terminated
because of his race.  (*Id.*).  Plaintiff asked, "I don't understand, does that mean
I'm fired?"  (*Id.* at ¶ 43).  Nation-Jumpp confirmed, "Yes, that means you're
fired."  (*Id.*).

Plaintiff asked for permission to speak, and began to say, "I was so thrilled with the positioning of my patient." (TAC 8 ¶ 44).[5] Atkins interrupted him abruptly, put her hand over Plaintiff's mouth, and shouted at Nation-Jumpp to "leave [her] office right now." (*Id.*). Atkins shouted at Plaintiff, comparing "my little monkey" to another racial slur and telling him, "You took history in high school! You should be ashamed of yourself!" (*Id.*). Plaintiff felt intimidated, threatened, and humiliated by Atkins's outburst, and replied, "That's not what I said. You misunderstood." (*Id.* at 9 ¶ 44). Ifill, who attended the meeting as Plaintiff's Union delegate, stated, "You still do not understand! All you do is think of yourself!" (*Id.*). Nation-Jumpp eventually returned to her office as Atkins continued to speak aggressively to Plaintiff. (*Id.* at ¶ 46). Atkins told Plaintiff, "This can be reported to the ethics committee. You could lose your license." (*Id.*). Atkins added, "You can resign now, and work wherever you want to, with no issues, and you can go on with your life." (*Id.*). Plaintiff was confused by Atkins's suggestion, as he thought Nation-Jumpp had already terminated his employment. (*Id.*). Plaintiff believed Nation-Jumpp and Atkins were working together to persuade him to resign. (*Id.* at ¶ 47).[6] On October 29, 2019, Nation-Jumpp issued a letter

---

[5]   Due to a numbering error in the TAC, there are two paragraphs numbered 44. One appears on page 8, and the other appears on page 9. Accordingly, citations to each include a page number.

[6]   During arbitration proceedings, Nation-Jumpp testified that as part of Plaintiff's agreement to return to work, he was required to write an apology letter to the CNAs who were present during the incident. (Award 7). When she read the apology letter, she believed it demonstrated that he was not willing to apologize or to take responsibility for his actions. (*Id.* at 8). Following the October 17, 2019 meeting, she determined that Plaintiff had not fulfilled the condition of having to apologize to his coworkers, because

terminating Plaintiff's employment.  (Award 7).  On or about October 30, 2019, one of Plaintiff's coworkers informed him that prior to Plaintiff's termination, Drax had solicited signatures on a petition to terminate Plaintiff's employment.  (TAC ¶ 51).  Archcare management did not stop Drax from circulating the petition.  (*Id.*).

After Plaintiff's termination, Jackson agreed to write a letter of recommendation to aid Plaintiff in securing future employment.  (TAC ¶ 52). Agpawa attempted to dissuade Jackson from writing the letter.  (*Id.*).  Jackson later showed her letter to Atkins, who "threw it on her desk dismissively."  (*Id.* at ¶ 53).  Plaintiff applied for unemployment benefits immediately upon his termination, but Archcare opposed his application for unemployment.  (*Id.* at ¶ 54).  Plaintiff characterizes Archcare's opposition as "alleging falsehoods such as claiming that Plaintiff referred to a child as a little monkey in front of staff and the family of the child."  (*Id.*).[7]  An Administrative Law Judge rejected Archcare's opposition and granted unemployment benefits to Plaintiff.  (*Id.* at ¶ 55).

### 4.   Plaintiff's Grievance, Arbitration, and Reinstatement

In November of 2019, Plaintiff met with Union Supervisor Al Sherman and explained that he was concerned about Atkins representing him at an

---

his apology was not sincere.  (*Id.* at 9).  Accordingly, she terminated his employment. (*Id.*).

[7]   The Court notes that the only "falsehood" it perceives in Archcare's opposition is that the child's family is not alleged to have been present during the October 4, 2019 incident.

upcoming grievance hearing regarding his termination, because she had previously exhibited bias and aggression toward him and had tried to force him to resign.  (TAC ¶ 56).  Sherman assured Plaintiff that another Union representative, Julio Vives, would represent him at the grievance hearing.  (*Id.*). Plaintiff made multiple attempts to call Vives prior to the hearing, but Vives did not return Plaintiff's calls.  (*Id.* at ¶ 57).  On November 18, 2019, Plaintiff arrived at the grievance hearing and encountered Atkins.  (*Id.* at ¶ 58).  When Plaintiff asked Atkins whether Vives was coming to represent him, Atkins responded, "It is not Julio's job to represent you, it is my job!"  (*Id.*).  Atkins did not consult with Plaintiff or prepare him in any way prior to the grievance hearing.  (*Id.*).  On November 25, 2019, Nation-Jumpp sent a form letter to Atkins acknowledging the November 18, 2019 grievance hearing, which letter also included a statement that "the Union's remedy is that [Plaintiff] be reinstated with no back pay, sensitivity training, a change in unit, and a last chance agreement."  (*Id.* at ¶ 59).  Plaintiff alleges that the Union never actually suggested to Archcare that Plaintiff be reinstated, but rather that Atkins had tried to force him to resign.  (*Id.* at ¶ 60).  Unsurprisingly to Plaintiff, the letter stated that Archcare would reject the Union's suggested remedy.  (*Id.*).

On December 5, 2019, Plaintiff sent an email to the Union's Executive Vice President, Milly Silva, explaining the bias and hostility he experienced from Atkins and requesting that the Union assign him another representative to handle his appeal.  (TAC ¶ 61).  Plaintiff also attempted to email Vives directly, but he alleges that Vives began to block his emails.  (*Id.* at ¶ 62).  On

11

February 24, 2020, Plaintiff received a letter from Vives stating that the Union would represent him in his arbitration proceedings.  (*Id.* at ¶ 63).  Arbitrator Maier found that Archcare had violated the CBA by terminating Plaintiff without just cause, and he ordered Archcare to reinstate Plaintiff to his previous position with back pay.  (*Id.* at ¶ 64; Award 25-26).

Plaintiff believes he was the target of bias and aggression toward him because he is white.  (TAC ¶ 56).  During this process, Plaintiff experienced, and continues to experience, emotional stress and mental anguish that has affected his relationships with his family members.  (*Id.* at ¶ 65).  Plaintiff has visited his doctor on multiple occasions and was prescribed medication for the emotional stress caused by this ordeal.  (*Id.*).

## B.    Procedural Background

Plaintiff filed the initial complaint in this matter on June 2, 2020.  (Dkt. #1).  That same day, Plaintiff filed an amended complaint (Dkt. #3), which was refiled on June 5, 2020, to correct a filing deficiency (Dkt. #6 ("Amended Complaint")).  On September 3, 2020, the Court ordered Plaintiff to show cause in writing by October 2, 2020, why this case should not be dismissed for failure to serve Defendants.  (Dkt. #7).  On September 25, 2020, Plaintiff's counsel filed an affidavit indicating that he had served Archcare on June 24, 2020.  (Dkt. #6, 8).  That same day, Plaintiff's counsel filed a proposed Clerk's Certificate of Default as to Archcare (Dkt. #10), which he refiled on September 26, 2020 (Dkt. #12), and again on September 28, 2020 (Dkt. #15),

to correct filing deficiencies.  The Clerk of Court entered a Certificate of Default as to Archcare on September 28, 2020.

On October 2, 2020, Plaintiff's counsel filed a declaration, an affirmation, and a memorandum of law in opposition to the Court's prior Order to Show Cause.  (Dkt. #17-19; *see also* Dkt. #7).  That same day, Plaintiff's counsel filed a proposed Order to Show Cause for a default judgment against Archcare, along with both a declaration and an affirmation in support of his proposed Order.  (Dkt. #20-22).  In his affirmation in support of his proposed Order to Show Cause, Plaintiff's counsel represented that he had repeatedly attempted to serve the Union Defendants but had been unsuccessful.  (*See* Dkt. #22 at 3). Given Plaintiff's representations, on October 5, 2020, the Court granted Plaintiff an extension to November 5, 2020, to effectuate service on the Union Defendants.  (Dkt. #23).  That same day, Plaintiff filed a proposed default judgment against Archcare.  (Dkt. #24).  On October 7, 2020, the Court ordered Archcare to show cause why default judgment should not be entered against it, and scheduled a show cause hearing for December 10, 2020.  (Dkt. #25).

On October 16, 2020, counsel for the Union Defendants entered a notice of appearance.  (Dkt. #26, 28).  On October 21, 2020, in accordance with the Court's October 5 Order, Plaintiff filed affidavits of service of the Summons and Amended Complaint on both the Union and Atkins.  (Dkt. #30, 31).  On October 30, 2020, counsel for the Union Defendants filed a letter motion for a

conference regarding its intent to file a motion to dismiss Plaintiff's Amended Complaint.  (Dkt. #33, 34).

On November 4, 2020, counsel for Archcare filed a memorandum of law in response to the Court's October 7, 2020 Order to Show Cause, along with a supporting declaration and affirmation.  (Dkt. #36-38).  That same day, counsel for Archcare filed a letter motion for leave to file a motion to dismiss Plaintiff's Amended Complaint.  (Dkt. #39).  The following day, the Court dissolved its October 7, 2020 Order to Show Cause and converted the then-scheduled show cause hearing to a pre-motion conference.  (Dkt. #40).  On December 10, 2020, the Court held a pre-motion conference at which it directed Plaintiff to file a letter stating his position on arbitration and informing the Court whether he would be filing a second amended complaint.  (*See* Minute Entry for Dec. 10, 2020).  On December 18, 2020, Plaintiff filed a letter requesting a stay of this action pending the conclusion of arbitration proceedings.  (Dkt. #44).  On December 21, 2020, the Court granted Plaintiff's request for a stay and directed him to file an amended complaint within 14 days of his receipt of the arbitrator's decision.  (Dkt. #45).

A hearing was held before Arbitrator Philip L. Maier of the American Arbitration Association (the "AAA") on February 25, 2021, and April 6, 2021. (Award 1).  The parties agreed to submit to arbitration the issues of (i) whether there was a just cause for Plaintiff's termination, and (ii) if not, what remedy was proper.  (*Id.* at 2).  Arbitrator Maier's Opinion and Award, dated July 6, 2021, found that there was no just cause for Plaintiff's termination because

Plaintiff's intent in making the comment had been innocuous rather than racist, and because Plaintiff had apologized as directed.  (Award 20-21, 23).  Arbitrator Maier found that Plaintiff should be reinstated to his former position and made whole for any lost wages, benefits, and other losses that he may have incurred as a result of having been terminated without just cause.  (*Id.* at 25-26).

On July 23, 2021, Plaintiff's counsel filed a second amended complaint (the "SAC" (Dkt. #56)), along with a letter informing the Court that the arbitration had concluded and that the parties were prepared to resume litigating Plaintiff's remaining claims (Dkt. #57).  The Court lifted the stay in this matter and directed Defendants to respond to the SAC on or before August 6, 2021.  (Dkt. #58).  On August 6, 2021, both Archcare and the Union Defendants requested leave to file motions to dismiss the SAC.  (Dkt. #59, 60).  On August 11, 2021, Plaintiff responded and requested leave to further amend his complaint to withdraw certain claims and to restore others.  (Dkt. #61).  The Court directed Plaintiff to file a third amended complaint on or before August 25, 2021, and set a briefing schedule for Defendants' anticipated motions to dismiss.  (Dkt. #62).

On August 25, 2021, Plaintiff filed the Third Amended Complaint (the "TAC" (Dkt. #63)), the operative pleading in this matter, incorporating the Award as Exhibit 1.  The TAC alleges seven causes of action.  As his first three causes of action, Plaintiff alleges that Archcare and Atkins discriminated against him "by treating him differently and creating a hostile work

15

environment due to his race," in violation of 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL.  (TAC ¶¶ 66-74).  As his fourth cause of action, Plaintiff alleges conspiracy to discriminate against him in violation of 42 U.S.C. § 1985.  (*Id.* at ¶¶ 75-77).  More specifically, Plaintiff alleges that all Defendants "conspired to deny Plaintiff of privileges and immunities under the law by unjustly forcing him to resign from his position due to his race and fabricating evidence to conceal their bad acts." (*Id.* at ¶ 76).  As his fifth and sixth causes of action, Plaintiff alleges that all Defendants aided and abetted discrimination against Plaintiff because of his race, in violation of the NYSHRL and the NYCHRL.  (*Id.* at ¶¶ 78-83).  Finally, Plaintiff alleges that the Union breached its duty of fair representation by failing to fairly represent Plaintiff's interest in the grievance process, and that Archcare violated the CBA by terminating Plaintiff's employment without just cause and discriminating against him.  (*Id.* at ¶¶ 84-87).[8]

On September 22, 2021, Defendants requested an extension of time to file their motions to dismiss, which request the Court granted.  (Dkt. #64, 65).  Archcare and the Union Defendants each filed a motion to dismiss and supporting memorandum of law on October 1, 2021.  ((Dkt. #. #66 (Union Defendants' motion to dismiss)); Dkt. #68 (Archcare's motion to dismiss)).  On

---

[8]     Although not explicitly stated in the TAC, Plaintiff brings the Seventh Cause of Action pursuant to Section 301 of the LMRA, *as amended*, 29 U.S.C. § 185, against Archcare for breach of the CBA and against the Union for a breach of the duty of fair representation, resulting in "a 'hybrid § 301/fair representation' action."  *Tomney* v. *Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 735 (S.D.N.Y. 2005).

November 1, 2021, Plaintiff filed his consolidated opposition brief and a supporting declaration. (Dkt. #70, 71). On November 8, 2021, Defendants requested an extension of time to file their reply briefs, which request the Court granted the same day. (Dkt. #72, 73). On November 22, 2021, Archcare and the Union Defendants each filed a reply brief. (Dkt. #74 (Union Defendants' reply brief); Dkt. #75 (Archcare reply brief)). Accordingly, Defendants' motions are fully briefed and ripe for the Court's consideration.

## DISCUSSION

### A.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While the plausibility requirement "is not akin to a 'probability requirement,' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Moreover,

17

"[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## B.   Plaintiff Fails to State a Hybrid Claim Under Section 301 of the LMRA

"Ordinarily, an employee's only claim against a union for violation of the terms of a [CBA] is for violation of the duty of fair representation." *Staten* v. *Patrolmen's Benevolent Ass'n of City of New York, Inc.*, 282 F. Supp. 3d 734, 739 (S.D.N.Y. 2017) (internal citation omitted), *aff'd*, 736 F. App'x 17 (2d Cir. 2018) (summary order).  Accordingly, the Court begins by addressing Plaintiff's Seventh Cause of Action pursuant to Section 301 of the LMRA against Archcare for breach of the CBA and against the Union for a breach of the duty of fair representation.

### 1.   Applicable Law

"[W]hen the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation[,]" "an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *DelCostello* v. *Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983).  "To bring a hybrid LMRA § 301 claim, [an] employee must allege both [i] that the employer breached a [CBA] and [ii] that the union breached its duty of fair representation in redressing [his] grievance against the employer." *Sabater* v. *Montefiore Med. Ctr.*, No. 17 Civ.

7135 (JPO), 2020 WL 1673916, at *3 (S.D.N.Y. Apr. 6, 2020) (internal quotations and citation omitted); *accord White* v. *White Rose Food*, 128 F.3d 110, 113 (2d Cir. 1997). "As the claims against the employer and the union are inextricably interdependent in a hybrid cause of action, a plaintiff's ability to sue their employer is contingent on the threshold showing that the union breached its duty of fair representation." *Fleischer* v. *Barnard Coll.*, No. 19 Civ. 10738 (RA), 2020 WL 7360251, at *4 (S.D.N.Y. Dec. 15, 2020) (internal quotation marks and citations omitted), *aff'd*, No. 20-4213, 2021 WL 5365581 (2d Cir. Nov. 18, 2021) (summary order).

Plaintiff alleges that the Union failed to represent his interest in the grievance process "by discriminating against Plaintiff and acting against his interest[,] which caused Plaintiff harm." (TAC ¶ 85). "A union 'has a duty to represent fairly all employees subject to the [CBA].'" *Borici* v. *ABM Indus. Groups, LLC*, No. 21 Civ. 1826 (JPC), 2021 WL 5827640, at *3 (S.D.N.Y. Dec. 7, 2021) (quoting *Spellacy* v. *Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998)). "[T]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Vaughn* v. *Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010). Rather, "[a] breach of a union's duty of fair representation must involve 'conduct toward a member ... [that] is arbitrary, discriminatory, or in bad faith.'" *Sabater*, 2020 WL 1673916, at *3 (quoting *Vaca* v. *Sipes*, 386 U.S. 171, 190 (1967)).

"A union's actions are 'arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational.'" *Borici*, 2021 WL 5827640, at *3 (quoting *Air Line Pilots Ass'n, Int'l* v. *O'Neill*, 499 U.S. 65, 67 (1991) (internal quotation marks and citation omitted)). "A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" *Id.* (quoting *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am.* v. *Lockridge*, 403 U.S. 274, 301 (1971)). "Bad faith, which 'encompasses fraud, dishonesty, and other intentionally misleading conduct,' requires proof that the union acted with 'an improper intent, purpose, or motive.'" *Id.* (quoting *Spellacy*, 156 F.3d at 126); *see also Sim* v. *N.Y. Mailers' Union No. 6*, 166 F.3d 465, 472 (2d Cir. 1999) ("Bad faith requires a showing of fraudulent, deceitful, or dishonest action."). "Any substantive examination of a union's performance … must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." *Id.* (quoting *Airline Pilots Ass'n, Int'l* v. *O'Neill*, 499 U.S. 65, 78 (1991)).

If a plaintiff is able to establish that the union's conduct toward him was arbitrary, discriminatory, or in bad faith, he still must demonstrate "a causal connection between the union's wrongful conduct and [his] injuries." *Diaz* v. *Loc. No. 241, Transp. Workers Union of Am., Univ. Div.*, No. 17 Civ. 8898 (WHP), 2021 WL 1063184, at *5 (S.D.N.Y. Mar. 19, 2021) (quoting *Spellacy*, 156 F.3d

at 126); *accord Vaughn*, 604 F.3d at 709.  "In the arbitration context, the standard for causation is a demanding one: a cause of action for breach of the duty of fair representation only lies where the union's action seriously undermine[d] the arbitral process."  *Johnson* v. *Nat'l Football League Players Ass'n*, No. 17 Civ. 5131 (RJS), 2018 WL 8188558, at *8 (S.D.N.Y. Oct. 3, 2018) (internal citations and quotation marks omitted), *aff'd*, 820 F. App'x 51 (2d Cir. 2020) (summary order).

### 2.   Analysis

The Union argues that it represented Plaintiff fully and fairly in the grievance process, up to and including winning an arbitration on his behalf; and that the facts alleged in the TAC fail to give rise to any inference that the Union's handling of Plaintiff's grievance was arbitrary, discriminatory, or in bad faith.  (Union Br. 6-8.)  Plaintiff rejoins that notwithstanding his ultimate victory in the arbitration, the Union acted with discriminatory intent when Union delegate Ifill verbally attacked him and failed to represent his interest during his October 17, 2019 meeting with Nation-Jumpp — which, he claims, emboldened Nation-Jumpp to terminate Plaintiff in violation of the CBA.  (Pl. Opp. 22-23).  Plaintiff argues that Atkins and Ifill "allowed their personal racial animosity towards Plaintiff to interfere with their duty under the law."  (*Id.* at 24).

To review, the TAC alleges that Union shop steward Washington told one of Plaintiff's coworkers that he was a racist and called the compliance hotline to report him, which conduct Plaintiff describes as attempts "to get Plaintiff

terminated from [Archcare] because he is white[.]"  (TAC ¶¶ 22, 25).  Plaintiff

further alleges that at the October 17, 2019 meeting regarding his termination,

(i) Plaintiff "believed he was being terminated because of his race" (*id.* at ¶ 42);

(ii) Atkins — after demanding that Nation-Jumpp leave the room — raised her

voice at Plaintiff, telling him that he should be ashamed of himself and

equating the phrase "my little monkey" to a racial epithet, such that Plaintiff

"felt intimidated, threatened and humiliated as a white person" (*id.* at ¶ 44);

(iii) Ifill verbally attacked him and called him "selfish" rather than representing

his interest (*id.*); (iv) Atkins suggested he resign to avoid losing his license (*id.*

at ¶ 46); and (iv) Plaintiff felt that Atkins and Ifill "were attacking him because

of his race" (*id.* at ¶ 45).  Plaintiff further alleges that, following this meeting,

Vives and Atkins failed to consult with Plaintiff or prepare him in any way for

his November 18, 2019 grievance hearing (*id.* at ¶¶ 57-58); that the Union tried

to force Plaintiff to resign rather than suggesting that he be reinstated (*id.* at

¶ 60); and that Vives blocked Plaintiff's emails (*id.* at ¶ 62).  The Union

ultimately successfully grieved Plaintiff's case.  (*Id.* at ¶ 64).

　　　Plaintiff has not alleged "substantial evidence" to indicate that the

Union's conduct was arbitrary, discriminatory, or in bad faith.  *See Borici*, 2021

WL 5827640, at *3.  Plaintiff fails to allege any facts to suggest that the Union

delegates' animosity toward him was the result of discriminatory animus or

bad faith rather than a reaction to his October 4, 2019 statement, which they

perceived as racially insensitive.  Plaintiff's conclusory allegations that Ifill and

Atkins acted contrary to his interests are devoid of any specific factual

allegations demonstrating that either of them acted in bad faith or was motivated by discriminatory animus. While Plaintiff's allegations demonstrate that Ifill and Atkins may have been hostile toward him, personal hostility does not give rise to a breach of the duty of fair representation. *See Cumberbatch* v. *Metro N. Commuter R.R. Co.*, No. 92 Civ. 4220 (CPS), 1994 WL 62197, at *8 (E.D.N.Y. Feb. 7, 1994) (finding that plaintiff's allegation that his union representative "engaged in personal hostility toward him" was insufficient to show that the representative "had any bias toward him whatsoever, much less to the extent necessary to show that the [u]nion breached its duty"), *aff'd sub nom. Cumberbatch* v. *Metro-N. Commuter R. Co.*, 43 F.3d 1458 (2d Cir. 1994); *see also Early* v. *Eastern Transfer*, 699 F.2d 552, 556 (1st Cir. 1983) (noting that even assuming animosity on the part of the union's representative could be inferred, "this would not, standing alone, establish a breach of the duty of fair representation."); *cf. Maron* v. *Legal Aid Soc'y*, No. 21 Civ. 5960 (KPF), 2022 WL 1910247, at *13 (S.D.N.Y. June 2, 2022) (finding that plaintiff plausibly alleged a breach of the duty of fair representation where union published "a statement maliciously accusing [her] of being unable to do her job because of her race," and racial justice issues fell within the universe of activity contemplated by the union).

Moreover, even if Plaintiff had plausibly alleged that the Union's conduct toward him was arbitrary, discriminatory, or in bad faith, he has failed to allege that the Union's conduct "seriously undermined" the arbitral process, because the Union ultimately prevailed on his behalf at arbitration. *Johnson*, 2018 WL

8188558, at *8 ("In the arbitration context, ... a cause of action for breach of the duty of fair representation only lies where the union's action seriously undermine[d] the arbitral process."). Plaintiff was ultimately reinstated to his position and made whole for his lost wages. (Award 25-26). Because Plaintiff's claim for breach of the duty of fair representation fails, so too does his LMRA claim against Archcare. *Fleischer*, 2020 WL 7360251, at *4 ("[A] plaintiff's ability to sue their employer [under the LMRA] is contingent on the threshold showing that the union breached its duty of fair representation.").

## C.   Plaintiff Fails to State a Claim Under 42 U.S.C. § 1981

Next, the Court addresses Plaintiff's cause of action against Defendants Archcare and Atkins for discrimination and a hostile work environment in violation of 42 U.S.C. § 1981. Plaintiff alleges that "Defendants discriminated against Plaintiff by treating him differently and creating a hostile work environment due to his race in violation of the law; Defendants would not have treated Plaintiff as such but for his race, and there is no non-discriminatory basis for Plaintiff's treatment." (TAC ¶ 67).

### 1.   Applicable Law

Claims of racial discrimination under § 1981 are analyzed using the *McDonnell Douglas* framework. *Moleon* v. *Alston*, No. 21 Civ. 1398 (PAE), 2021 WL 5772439, at *8 (S.D.N.Y. Dec. 3, 2021) (citing *Brown* v. *City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Lopez* v. *S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987)). The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See Holcomb* v. *Iona Coll.*, 521 F.3d 130,

138 (2d Cir. 2008).  To do so, he must show that "[i] he belonged to a protected class; [ii] he was qualified for the position he held; [iii] he suffered an adverse employment action; and [iv] the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown*, 673 F.3d at 150 (quoting *Holcomb*, 521 F.3d at 138).

"[T]he burden of establishing a *prima facie* case in an employment discrimination case is minimal."  *Lenzi* v. *Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (internal citations omitted).  And at the motion to dismiss stage, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas*." *Vega* v. *Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015); *see also Forkin* v. *Loc. 804 Union (IBT)*, 394 F. Supp. 3d 287, 307 (E.D.N.Y. 2019) ("At the pleading stage, ... a plaintiff need not prove discrimination or even allege facts establishing every element of the *McDonnell Douglas prima facie* case.").  However, under Section 1981, a plaintiff must plausibly allege that "but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp.* v. *Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  "[I]t is insufficient to merely plead that race was a motivating factor in the discriminatory action."  *Brown* v. *Montefiore Med. Ctr.*, No. 19 Civ. 11474 (ALC), 2021 WL 1163797, at *5 (S.D.N.Y. Mar. 25, 2021) (citing *Comcast Corp.*, 140 S. Ct. at 1015).

"At the initial phase of the litigation, a plaintiff's allegations 'need only give plausible support to a minimal inference of discriminatory motivation.'" *Franchino* v. *Terence Cardinal Cooke Health Care Ctr., Inc.*, 692 F. App'x 39, 41

(2d Cir. 2017) (summary order) (quoting *Littlejohn* v. *City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015)).  An inference of discrimination can arise from:

> the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge; or when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class.

*Id.* at 41-42 (quoting *Littlejohn*, 795 F.3d at 312).

Separately, a hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Mohan* v. *City of New York*, No. 17 Civ. 3820 (KPF), 2018 WL 3711821, at *13 (S.D.N.Y. Aug. 3, 2018) (quoting *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 122 (2002)).  "It is axiomatic" that a hostile work environment claim is only actionable "when it occurs because of an employee's … protected characteristic." *LeLaurencio* v. *Brooklyn Children's Ctr., Superintendent*, 111 F. Supp. 3d 239, 248 (E.D.N.Y. 2001) (quoting *Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).  To establish a hostile work environment under Section 1981, "a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 321 (quotation marks and citations omitted).  "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be

deemed pervasive." *Id.* (citation omitted).  In evaluating "whether a plaintiff suffered a hostile work environment," a court "consider[s] the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 321 (citation omitted).  "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.*

### 2.   Application to Archcare

The TAC states that "because of" or "due to" Plaintiff's race, Archcare did nothing to put an end to the stigma perpetuated by Plaintiff's coworkers that he is racist (TAC ¶ 30), terminated his employment (*id.* at ¶ 42), and "treat[ed] him differently and creat[ed] a hostile work environment" (*id.* at ¶ 67). Archcare argues that these conclusory allegations do not meet Plaintiff's burden of pleading but-for causation and that the facts pleaded do not give rise to an inference of discriminatory intent.  (Archcare Br. 8-10, 12-15).  Archcare is correct.  Plaintiff fails to plead, with any specificity, that he would not have suffered such adverse actions had he not been white.  *See Comcast,* 140 S. Ct. at 1019.  Instead, his allegations establish that Archcare terminated his employment because it believed — correctly or incorrectly — that Plaintiff had made a racially derogatory statement to a patient and had failed to take sufficient responsibility for that statement.  (*See* Award 11-15).

Further, though Plaintiff claims that Archcare "treat[ed] him differently …
due to his race" (TAC ¶ 67), he does not allege how he was treated differently
than his colleagues, or why that difference could be attributed to
discriminatory animus.  For example, there is no indication that any Archcare
employee ever made any comments about Plaintiff's race, or that a non-white
colleague engaged in similar conduct and was treated more favorably than
Plaintiff.  Finally, though Plaintiff alleges a "hostile work environment due to
his race" (*id.*), he alleges no facts indicating that his coworkers' hostility toward
him was rooted in discrimination rather than disapproval of his conduct.
Plaintiff does not allege that anyone at Archcare criticized his performance in
ethnically degrading terms, made invidious comments about other white
employees, treated non-white employees more favorably than white employees,
or replaced him with a non-white individual.  *See Franchino*, 692 F. App'x at
41.  In short, Plaintiff has done no more than describe his putative
mistreatment and ask the Court to conclude that he was mistreated because
he was white. This is not sufficient.  *See, e.g., Lizardo* v. *Denny's, Inc.*, 270 F.3d
94, 104 (2d Cir. 2001) ("Plaintiffs have done little more than cite to their
mistreatment and ask the court to conclude that it must have been related to
their race.  This is not sufficient."); *Frascatore* v. *Blake*, 344 F. Supp. 3d 481,
493 (S.D.N.Y. 2018) (same); *Iscenko* v. *City of N.Y.*, No. 16 Civ. 6535 (LGS),
2017 WL 2880553, at *5 (S.D.N.Y. July 5, 2017) ("To state a claim, Plaintiff
must do more than simply 'cite to [his alleged] mistreatment and ask the court
to conclude that it must have been related to [his] race.'" (internal citations

omitted)).  Having alleged no facts that support Plaintiff's claim that Archcare's

actions were motivated by a racially discriminatory purpose, Plaintiff's

discrimination claim against Archcare under Section 1981 is dismissed.[9]

Further, and for the same reasons, the Court dismisses Plaintiff's hostile work

environment claim against Archcare under Section 1981.  *See Hicks* v. *Rubin*, 6

F. App'x 70, 73 (2d Cir. 2001) (summary order) (affirming dismissal of hostile

work environment claim for "same reason" as disparate treatment claim where

plaintiff failed to establish that supervisors' conduct toward plaintiff "was

motivated by race").

### 3.    Application to Atkins

"Employment discrimination claims against unions are analyzed

differently from claims against employers, in that claims against unions are

grounded in the union's duty of fair representation to its members."  *Saunders*

---

[9]    Archcare also argues that because Plaintiff's termination was reversed and he was
reinstated with back pay, he has not suffered the "adverse employment action" required
to sustain a discrimination claim.  (Archcare Br. 11-12).  It is true that various courts
have historically considered whether an employee was restored to the same salary,
benefits, and title when reinstated in order to determine whether there were adverse
consequences to the employee; and that some courts would not recognize adverse
consequences if the same material conditions were reinstated.  (*See* Archcare Br. 11-12
(collecting cases)).  However, a plaintiff who was terminated but nevertheless reinstated
can still demonstrate an adverse employment action under certain circumstances.
*Rommage* v. *MTA Long Island Rail Rd.*, No. 08 Civ. 836 (DLI) (ALC), 2010 WL 4038754,
at *7 n.5 (E.D.N.Y. Sept. 30, 2010) (observing that "under certain circumstances a
plaintiff who was terminated but nevertheless reinstated can demonstrate an adverse
employment action"), *aff'd*, 452 F. App'x 70 (2d Cir. 2012) (summary order); *see also*
*Shultz* v. *Congregation Shearith Israel of City of N.Y.*, 867 F.3d 298, 306 (2d Cir. 2017)
(notifying an employee of a prospective termination may constitute an adverse
employment action even if the employer later rescinds the notice or offers to restore
employment after the termination takes effect).  Because Plaintiff has failed to plead
facts giving rise to an inference of discriminatory intent, the Court need not determine
whether his termination, which was later reversed, constitutes an adverse employment
action.

v. *N.Y. Convention Ctr. Operating Corp.*, No. 20 Civ. 5805 (GHW), 2022 WL 3577773, at *3 (S.D.N.Y. Aug. 19, 2022); *see also Staten*, 282 F. Supp. 3d at 739 ("Ordinarily, an employee's only claim against a union for violation of the terms of a [CBA] is for violation of the duty of fair representation.").  Plaintiff, presumably aware that he cannot sue the Union under Section 1981 without pleading and proving a violation of the Union's duty of fair representation, instead pleads a claim directly against Defendant Atkins.

Plaintiff alleges that at the October 17, 2019 meeting regarding his termination, Atkins put her hand over Plaintiff's mouth, demanded that Nation-Jumpp leave the room, and raised her voice at Plaintiff, telling him that he should be ashamed of himself and equating the phrase "my little monkey" to a racial epithet, such that Plaintiff "felt intimidated, threatened and humiliated as a white person."  (TAC ¶ 44).  Plaintiff further contends that Atkins suggested that Plaintiff resign to avoid losing his license, and that Plaintiff felt that Atkins was "attacking him because of his race."  (*Id.* at ¶¶ 45-46).  Plaintiff claims that Atkins said to Jackson, "I understand that you disagree that Plaintiff is a racist," adding that "sometimes people are undercover."  (*Id.* at ¶ 49).  Finally, Plaintiff alleges that Atkins failed to consult with Plaintiff or prepare him in any way for his November 18, 2019 grievance hearing.  (*Id.* at ¶¶ 57-58).

At the outset, the Court rejects Plaintiff's attempt to hold Atkins individually liable for acts that, if pleaded against the Union, would require him to establish a breach of the duty of fair representation — which breach Plaintiff

has failed to establish.  As the Union observes in its opposition brief, "there is nothing to suggest that a union representative can be held to a higher standard under Section 1981 than the union itself."  (Union Br. 15).  *See Mussafi* v. *Fishman*, No. 12 Civ. 2071 (JGK), 2012 WL 5473874, at *9 (S.D.N.Y. Nov. 12, 2012) ("[U]nion agents are not personally liable to third parties for acts performed on the union's behalf." (citing *Atkinson* v. *Sinclair Ref. Co.*, 370 U.S. 238, 249 (1962) (finding that "[w]here the union has inflicted the injury it alone must pay," and observing that "this policy cannot be evaded or truncated by the simple device of suing union agents … in a separate count … for damages for violation of a [CBA] for which damages the union itself is liable"))).

Even if the Court were to allow Plaintiff's claim against Atkins in her individual capacity, the TAC does not allege any facts that support the specific allegation of racially discriminatory animus by Atkins, or that such was the but-for cause of any Union actions relating to Plaintiff.  Plaintiff alleges that Atkins "attack[ed] him because of his race" (TAC ¶ 45), told Plaintiff's coworker that he was "racist" (*id.* at ¶ 49), and "exhibited bias and aggression toward him because he is white" (*id.* at ¶ 56).  However, the specific factual allegations in the TAC demonstrate that it was Plaintiff's statement and subsequent ham-fisted attempts to explain his intent — and not his race — that motivated any alleged hostility by Atkins toward Plaintiff.  *See Moleon*, 2021 WL 5772439, at *9 (dismissing discrimination claim against union where the complaint made "broad allegations of the [u]nion's hostility, personal animosity, malice, bad faith, or generalized bias towards [plaintiff]," but "[did] not allege any facts that

31

support the specific allegation of racially discriminatory animus by the [u]nion, or that such was the but-for cause of any Union actions relating to [plaintiff]"). Moreover, the fact that a Union representative allegedly called Plaintiff "racist" does not, without more, evince a racial animus.  *See Frascatore*, 344 F. Supp. 3d at 492 (rejecting plaintiff's argument that "[d]efendants could only consider [p]laintiff a racist because he is white"); *Calvelos* v. *City of New York*, No. 19 Civ. 6629 (CM), 2020 WL 3414886, at *11 (S.D.N.Y. June 22, 2020) (finding that allegations that employer repeatedly called employee "racist" did not evince racial animus, but explicitly mentioning his race when threatening to fire him did).  For the above-stated reasons, Plaintiff's Section 1981 claim against Atkins is dismissed.

### D.      Plaintiff Fails to State a Claim Under 42 U.S.C. § 1985

Plaintiff further alleges that Archcare and the Union Defendants engaged in a conspiracy to deprive him of his rights under Section 1981 by "unjustly forcing him to resign from his position due to his race" and "fabricating evidence to conceal their bad acts," in violation of 42 U.S.C. § 1985.  (TAC ¶ 76).  Plaintiff does not specify which subsection of Section 1985 provides the statutory basis for Plaintiff's claim, but it appears that the operative subsection is Section 1985(3).

A conspiracy claim under Section 1985(3) contains four elements: "[i] a conspiracy, [ii] for the purpose of depriving any person ... of the equal protection of the laws ..., [iii] an act in furtherance of the conspiracy, and [iv] whereby a person is injured in his person or property or deprived of a right

or privilege of a citizen." *Benzinger* v. *NYSARC, Inc. N.Y. City Chapter*, 385 F. Supp. 3d 224, 236 (S.D.N.Y. 2019) (quoting *Iqbal* v. *Hasty*, 490 F.3d 143, 176 (2d Cir. 2007), *rev'd on other grounds by Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009)). "To succeed, a plaintiff must also show that there was 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Id.* (quoting *Griffin* v. *Breckenridge*, 403 U.S. 88, 102 (1971)). "A plaintiff 'must [further] provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end[,]' along with 'some details of time and place and the alleged effects of the conspiracy.'" *Id.* (quoting *Romer* v. *Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) (internal quotation marks and citations omitted)). "Significantly, vague and unsupported assertions of conspiracy ... do not suffice." *Reid* v. *City of N.Y.*, No. 20 Civ. 9243 (KPF), 2022 WL 2967359, at *20 (S.D.N.Y. July 27, 2022) (internal citations omitted); *accord Webb* v. *Goord*, 340 F.3d 105, 111 (2d Cir. 2003). Section 1985(3) "provides no substantial rights itself to the class conspired against.  The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere[.]" *Benzinger*, 385 F. Supp. 3d at 236 (citing *United Bhd. of Carpenters & Joiners of Am.* v. *Scott*, 463 U.S. 825, 833 (1983) (internal citations and quotation marks omitted)).

As the Court has discussed above, Plaintiff has failed to plead discriminatory animus as required to state a claim under Section 1981. Accordingly, his claim under Section 1985 also must be dismissed.  *See*

*Morales* v. *City of N.Y.*, 752 F.3d 234, 238 (2d Cir. 2014) (affirming dismissal of plaintiff's claim under Section 1985 where he failed to allege facts suggesting that defendants acted with any discriminatory animus).  Further, the TAC does not include any factual allegations that suggest that Defendants engaged in a conspiracy, and Plaintiff's "vague and conclusory" allegations do not plausibly allege the existence of a conspiracy between Archcare and the Union Defendants.  *See Roundtree* v. *NYC*, No. 19 Civ. 2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y Apr. 28, 2021) (finding plaintiff's "bare allegations" that defendants engaged in a conspiracy insufficient to state a claim under Section 1985(3)) (collecting cases); *see also Doe* v. *Fenchel*, 837 F. App'x 67, 68 (2d Cir. 2021) (summary order) (affirming dismissal of Section 1985(3) claim where plaintiff's "naked assertions" that defendants engaged in impermissible conspiracy were "devoid of further factual enhancement" (internal quotation marks and alterations omitted)); *Booker* v. *Griffin*, No. 16 Civ. 72 (NSR), 2018 WL 1614346, at *15 (S.D.N.Y. Mar. 31, 2018) (dismissing Section 1985(3) claim where plaintiff's allegations suggested non-discriminatory reason for defendants' alleged actions); *Patterson* v. *City of New York*, No. 16 Civ. 3525 (NGG) (SMG), 2017 WL 3432718, at *16 (E.D.N.Y. Aug. 9, 2017) (same), *aff'd*, 758 F. App'x 217 (2d Cir. 2019) (summary order).  Indeed, Archcare and the Union were adversaries in the arbitration proceeding.  *See Ciambriello* v. *County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (dismissing Section 1983 conspiracy claim against union because "the very proceeding in which [plaintiff] alleges that [the union] conspired with the County — the

arbitration — placed [the union] and the County in adversarial positions"). Because the TAC is devoid of factual allegations that plausibly suggest that Defendants conspired to force Plaintiff to resign from his position due to his race, Plaintiff's Section 1985(3) claims fail as a matter of law and are dismissed.

**E.    The Court Declines to Exercise Supplemental Jurisdiction over Plaintiff's Remaining Claims**

Finally, the Court addresses whether to exercise supplemental jurisdiction over Plaintiff's remaining discrimination and aiding and abetting claims alleged under the NYSHRL and the NYCHRL.  Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  However, such jurisdiction is discretionary, *see City of Chicago* v. *Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997), and a district court "may decline to exercise supplemental jurisdiction" if "the claim raises a novel or complex issue of State law," 28 U.S.C. § 1367(c)(1), or the court "has dismissed all claims over which it has original jurisdiction," *id.* § 1367(c)(3).

In deciding whether to exercise supplemental jurisdiction, a district court must balance the traditional "values of judicial economy, convenience, fairness, and comity[.]"  *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 (1988).  Both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed

as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers* v. *Gibbs*, 383 U.S. 715, 726 (1966)); *accord Yany's Garden LLC* v. *City of New York*, No. 20-3419, 2022 WL 288071, at *3 (2d Cir. Feb. 1, 2022) (summary order) (stating generally that "if all federal claims are dismissed before trial, the state claims should be dismissed as well" (quoting *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 56 (2d Cir. 2004))).

The Court finds that exercising supplemental jurisdiction over Plaintiff's remaining claims would be inappropriate in this case.  The Court has dismissed Plaintiff's federal claims at the threshold of this case, and his city and state claims implicate different substantive standards.  *See, e.g., Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (explaining that "claims under the City HRL must be reviewed independently from" and "more liberally" than their federal counterparts); *McHenry* v. *Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020) (observing that "[i]n August 2019, the NYSHRL was amended to direct courts to construe the NYSHRL, like the NYCHRL, [more] liberally" (internal quotation marks omitted)).  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims.  *See Pompey-Primus* v. *Success Acad. Charter Sch., Inc.*, No. 21 Civ. 3981 (KPF), 2022 WL 504541, at *3 (S.D.N.Y. Feb. 17, 2022) (declining for similar reasons to exercise supplemental jurisdiction over NYSHRL and NYCHRL claims after dismissing Title VII claim at the Rule 12(b)(6) stage).

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss are GRANTED. Plaintiff's claims brought under federal law are dismissed with prejudice, and Plaintiff's claims under state and city law are dismissed without prejudice to their refiling in state court.  Further, because Plaintiff has already amended his pleadings three times, and because he has given no indication that he can amend them further to plead viable claims, the Court will not grant leave to amend under Federal Rule of Civil Procedure 15.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      September 8, 2022
            New York, New York

_____
       KATHERINE POLK FAILLA
      United States District Judge